**SAM KANE PACKING CO. et al.,**
**Plaintiffs-Appellants,**

v.

**AMALGAMATED MEAT CUTTERS AND BUTCHER WORKMEN OF NORTH AMERICA, AFL–CIO, and its Local No. 171, Defendants-Appellees.**

No. 72–3026.

United States Court of Appeals,
Fifth Circuit.

May 16, 1973.

Harold Alberts, Corpus Christi, Tex., A. J. Harper, II, L. G. Clinton, Jr., Houston, Tex., for plaintiffs-appellants.

L. N. D. Wells, Jr., Dallas, Tex., Frank Herrera, San Antonio, Tex., for defendants-appellees.

Before RIVES, GOLDBERG and MORGAN, Circuit Judges.

LEWIS R. MORGAN, Circuit Judge:

This appeal raises the issue of whether or not a certain dispute between an employer and a labor union was subject to arbitration under the collective bargaining agreement between the parties. The district court for the Southern District of Texas on summary judgment held that the dispute was indeed arbitrable and went on to enforce the unilateral arbitration award which had been issued by a single, union-appointed arbitrator. The company appeals both the finding of arbitrability and the enforcement of the award. After careful consideration, we affirm in part and remand in part.

I

Sam Kane Packing Company employed about 200 workers, with approximately 45 engaged in operations on the "kill floor". These workers were represented by appellee union, Amalgamated Meat Cutters and Butcher Workmen of North America and its Local No. 171.

The company alleges that it had been having difficulty with its kill floor employees over a fairly lengthy period of time. The company charges that these employees were engaged in slowdowns and intentionally sloppy work. The events giving rise to the current controversy between the union and the employer occurred on July 20, 1971. Apparently the company had called a meeting of kill floor employees to discuss the above mentioned problems. Following this meeting there occurred a disruption which resulted in no more work being done by these employees that day or thereafter. The exact nature and causes of this disruption are integral parts of the underlying dispute here. For our

purposes it is sufficient to say that company officials called the police and had the employees removed from the premises. The company apparently takes the position that these employees engaged in a "work stoppage" or "strike" and that their removal and subsequent discharge was lawful under the contract. For its part, the union took the position immediately that the action by the company in removing these employees from the premises constituted a lockout in violation of the contract.

There was a period of correspondence, or at least attempted correspondence, between union and company officials. By letter of July 31, 1971, the union notified the company that it planned to invoke the contractual grievance procedures to resolve this dispute, suggesting that the company agree to go directly to arbitration on the matter. At that time the union also ordered the employees to return to work. The employer countered with a statement that the matter was not subject to arbitration and that the workers would not be allowed to return and had been discharged and replaced.

Despite the company's opposition to arbitration, the union went ahead with arbitration procedures. Under the contract each party was to appoint a representative to the arbitration panel and the two representatives were to select a third by mutual agreement.[1] If either party failed to appoint a representative, the contract stated that the single representative appointed by the other party would have full power to issue a binding adjudication on the merits.

The union appointed its representative and repeatedly notified the company to appoint an arbitrator so that a third

---

1. The contract reads as follows:

*Section 8.* Either party may request arbitration of an unsettled grievance after exhaustion of the grievance procedure hereinabove set out. The right of either party to request arbitration over an unadjusted grievance is limited to a period of ten (10) calendar days from the final action taken on such grievance under the last step in the grievance procedure above detailed.

One (1) representative shall be appointed by the Company and one (1) representative shall be appointed by the Union to act as arbitrators for each grievance. Such appointments must be made by the parties within one (1) week after the written request by either party to submit the grievance to arbitration.

If either the Company or the Union fails to appoint their respective arbitrator within said one (1) week period, then the arbitrator so appointed by the other party shall promptly arbitrate and settle such grievance or grievances, and his decision or decisions shall be final and binding upon the parties.

After such arbitrators are so appointed, the party or parties desiring arbitration shall promptly within two (2) days present in writing to the arbitrators so appointed the question and/or questions and the matter and/or matters to be arbitrated. A copy of such questions and matters shall be delivered to the opposite party. Within one (1) week after such notification, the other party shall give in like manner similar written notice in defense of its position. It is understood that the party or parties initiating arbitration shall not introduce any additional question or matter which is not relevant to the matter to be arbitrated.

If the two (2) arbitrators are so selected and appointed as above provided, then the two (2) arbitrators shall select the third (3rd) arbitrator, who shall be impartial and distinterested and not in any way connected with either the Company or the aggrieved employee or employees or the Union. In the event that the two (2) arbitrators shall fail within five (5) calendar days to select a third (3rd) arbitrator, then upon request of either party, the Federal Mediation and Concilliation Service shall be requested to submit a list of five (5) arbitrators, each of whom shall be a impartial person qualified to act as an arbitrator. From this list the Union shall substract two (2) names, then the Company shall subtract two (2) names, and the first person's name which remains on the list then shall be the arbitrator. The reasonable expense of the third (3rd) arbitrator together with any other arbitration costs shall be borne equally by the respective parties. The decision of a majority of the arbitration committee shall be final and binding upon the parties hereto.

could be chosen. The company consistently refused to agree that arbitration was required. The union appointed State Senator Joe Bernal as its representative. The union informed the company that it had scheduled an arbitration hearing before Senator Bernal on August 23, 1971. The company, however, obtained an ex parte restraining order from the district court preventing that arbitration proceeding. After a hearing on August 28th, the court dissolved the restraining order, thus permitting the arbitration to proceed. The company was notified of the rescheduled arbitration set for August 30, but refused to participate in any way, taking the position that it could not be forced to arbitrate until a court had determined the issue of arbitrability as a final matter.

It appears that the company did inform the union that while it took the position that there would be no arbitration in this case because it was not contractually agreed to, if there was to be any arbitration the company's representative would be Mr. Harold Alberts, the company attorney. Both the union attorney, Mr. Herrera, and the union representative, Senator Bernal, were clearly informed of this position in advance of the scheduled hearing date.

When the company did not appear to participate in the August 30th hearing, arbitrator Bernal conducted a full proceeding with those present. About three weeks later Senator Bernal issued a lengthy opinion finding that the company unfairly locked out the employees and ordering reinstatement with pay and benefits. Because of the company's refusal to participate, only union witnesses and counsel appeared before the arbitrator. The company then refused to comply with the award, taking the position that in the first instance it did not have to arbitrate at that time because a court had not decided as a final matter that it was bound to arbitrate under the contract. Secondly, the company maintained that it did not have to comply with Senator Bernal's award because contract pro-

cedures had not been followed and, under the facts of this situation, the contract did not allow the union representative to proceed on his own.

## II

■ This case must be resolved by construction of certain clauses in the collective bargaining agreement in force between these parties. Of course, these clauses cannot be evaluated out of context or unmindful of the contract and industrial setting as a whole. However, unless there is patent ambiguity, the plain meaning of the words should generally be followed.

At the heart of the dispute is the interpretation of Article V entitled, "Grievance and Arbitration":

> *Section 1.* For the purposes of this agreement, the term "grievance" means a written dispute, claim or complaint arising under and during the term of this labor contract between the Company and the Union or between the Company and any employee or employees in the bargaining unit concerning the effect, interpretation, application, claim of breach or violation of an expressed provision or provisions of this contract. Such matters shall be processed through the grievance procedure without resort to a strike or a lock-out, and if either party hereto resorts to any action violative of Article IV (No Strike, Slow-Down, Work Stoppage) of this agreement, the grievance and arbitration provisions of this article shall be null and void and of no effect and either party hereto shall have the immediate right to seek redress from the appropriate court without the necessity of exhausting the grievance and/or arbitration procedures hereunder.

Article IV, referred to in the above passage, reads in pertinent part:

## ARTICLE IV—NO STRIKE, SLOW-DOWN, WORK STOPPAGE

> *Section 1.* During the term of this agreement, the Company agrees that it

will not lock out the employees covered by this agreement.

*Section 2.* During the term of this agreement, the Union agrees that it will not sanction, call, acquiesce or engage in or cause any strike, sit-down, slow-down, picketing, sympathy strike or other work stoppage against the Company for any reason. The Union agrees also that it will not for any reason during the term of this agreement sanction, call, acquiesce or engage in any curtailment, restriction or interference with the work of the Company or of any of its agents, servants or employees, or advise that such action be taken. Any employee covered by the terms of this agreement participating in any action prohibited by this section may be disciplined by the Company either by discharge or lesser penalty.

\*     \*     \*     \*     \*     \*

*Section 5.* The Company shall have the right to discipline up to and including discharge any employee who instigates, participates in or gives leadership to any activity prohibited by this Article. *If the Company discipline in this regard is challenged through the grievance procedure and the same proceeds to arbitration, the arbitrator shall have the power to review the reasonableness of the penalties imposed, but they may order back pay only upon a finding of innocence.* (Emphasis supplied).

These contract provisions are the only ones which have a direct bearing on the issue of arbitrability in this case. It now becomes encumbent on this court to evaluate their meaning as they apply to this situation.

### III

In its opinion, the district court held that the dispute in this case was arbitrable despite the employer's objections that the exclusionary language in Article V withdrew the issue from arbitration since it involved a charge of lockout (and for that matter, a cross-charge of a strike). The district court disagreed with the employer, holding that the cross reference in Article IV was modified by the parenthetical material which alluded only to strikes, slow-downs and work stoppages. The court construed the cross reference to apply only to Section 2 of Article IV and not to Section 1, the lock-out section. We agree with both the union and employer that this is a rather strange and unnatural construction of this contract. The union is apparently ready to agree that whatever the exclusionary clause means, it does not leave out lock-outs and, if it otherwise applied to this situation, the construction given it by the district court is clearly erroneous. Therefore, we turn to other possible constructions of this contract.

■ At the outset, the court feels that one of the problems which has created so much difficulty for these parties is the terminology used. The company throughout has taken the position that it was acting lawfully under the contract because it was disciplining these workers either for the alleged slow-downs which occurred prior to July 20, 1971, and/or for the alleged refusal to return to work after the coffee break and speech on July 20th. The union, in its earliest letters, took the position that the "removal" on July 20 was a lockout in violation of the contract. The court feels that use of the term "lockout" has created much of the confusion in this case. It seems clear to the court that the company considered these employees discharged soon after the events of July 20th. When the union, while seeking arbitration, ordered its employees back to work, the company replied that they were no longer employed and had been replaced. Thus we feel the real dispute between the union and the company here is not over direct damages dependent upon whether this was a strike or a lockout. We feel certain that the exclusion to the grievance machinery found in Article V, whatever it may mean, was not intended to prevent arbitration of the real issues in this case.

Those real issues as we see it are whether or not the company was justified in refusing to allow these individuals to return to their jobs and whether or not it was justified in having them removed from the premises by the police for violating the contract. In short, what the union was seeking, as shown here by the final award given by the union's representative as sole arbitrator, was a determination of whether or not the company had any justification in the sanctions it took against these employees, be it the sanction of having them removed by the police or the ultimate sanction of discharge.

We find that the parties had unquestionably agreed to arbitrate that issue by the express provisions of Article IV, Section 5. The company alleges that it was simply disciplining its employees for violation of the prohibitive sections of Article IV. That was the only alleged justification for all of its actions. It does not seem to matter by what term the union seeks to call the company's acts. We think the company has seized on the fact that the union referred to the company's subsequent action as a "lockout" in an attempt to avoid arbitrating its dismissal of these employees. The only relief that the union sought before the arbitrator in the proceedings held was reinstatement and back pay for the employees on the kill floor from the time that they were removed by police on instructions of the company. Any mass removal of employees or firing by the company during an alleged work stoppage could be characterized as a "lockout" in order to avoid arbitration. Yet the more specific section, Section 5 of Article IV, which lacks any of the ambiguities of Article V, seems so clearly to contemplate arbitration of such discipline that this court can reach no conclusion other than the fact that the parties had agreed to arbitrate this issue.

We note that this analysis of the contract structure and facts in this case is extremely similar to that which this court enunciated in United Steelworkers v. American International Aluminum Corporation, 5 Cir. 1964, 334 F.2d 147. In that case the court stated:

We can assume that the Employer is correct that neither the Employer nor Union has any right to demand arbitration of a controversy concerning whether there has been a strike, picketing, stoppage, slowdown, sitdown, stayin, or other curtailment or interference with work on the part of the employees or a lockout on the part of the employer. *But if a discharge resulted from either strike or work stoppage on the union's part or a lockout by the employer, the contract plainly recognized that this dispute was open for arbitration.* And certainly, whatever arguments might be mustered for a contrary result, the purpose to exclude a grievance over discharge flowing from a work stoppage is not so clear as to permit a court, under the guise of contract construction, to invade that territory now reserved to the arbitrator. (Emphasis supplied and citations omitted). Id. at 151.

Here discipline resulted from this occurrence whether or not it is characterized as a lockout or a strike. These employees have simply not been allowed to work for this company as union employees in their old jobs. That is discipline. That is within the express arbitration clause found in Section 5 of Article IV.

In seeking to avoid this analysis, the employer argues that *American International Aluminum* is not applicable to this case because the court there assumed that the employer was right in his contention that the underlying issue of a strike or lockout could be arbitrated. As pointed out, there is no question that discipline resulted from either the strike or lockout, however it is characterized. All that *American Aluminum* requires is that the contract envisions arbitration for any discipline which results from a strike or lockout. The contract in this case unquestionably envisions such arbitration.

As the court in *American International Aluminum* pointed out, the primary reason that contracting parties often except arbitration of strikes and lockouts from the grievance and arbitration proceedings is that this would eliminate in such instances the very difficult question in a suit by the employer against the union, or the union against the employer, for damages resulting from an unauthorized strike or lockout as to whether the controversy had to first be submitted to arbitration rather than going directly into court. Id. at 151, n. 7.

While we do not find it necessary to construe the language in Article V in the exception clause because of the more specific language found in Article IV, Section 5, we note that the difficult problem of suits for damages being subject to prior arbitration is probably the very reason that the exclusionary clause was included in that article. In all probability the language inserted was to make unquestionably sure that neither the employer or union would be able to use as a defense to a suit for damages for contract breach the claim that the issue had to first go to arbitration and damages be determined by arbitration. This is far and away the most rational construction of that section and avoids the difficulties in any other construction which both sides have recognized throughout this proceeding. Any construction of Article V which does not find the purpose to be that set forth above or find that what in effect Article V does is give an option to the aggrieved party to go to arbitration or seek court relief would be highly strained in light of the general nature of collective bargaining relationships and would undoubtedly cause great concern to the parties.

We, therefore, find that this was indeed an arbitrable dispute under the contract and that the real issue involved here, no matter how it was phrased, was what punishment, if any, could be inflicted on these employees. As noted, this was not the case when the union was seeking some sort of damages over and above reinstatement for an illegal lockout. Nor was it a case, such as would come up in a strike, where the employer was seeking damages to his business from an illegal work stoppage by the union. Rather, it was simply a case of evaluating whether there was just grounds for discipline, and whether the discipline was properly meted out. The contract expressly envisions arbitration of such an issue. There is no ambiguity.

■ There is, as previously noted, a very strong presumption favoring arbitration of labor disputes where the contract is capable of such a construction. As this court pointed out in Communications Workers v. S. W. Bell, 5 Cir. 1969, 415 F.2d 35, 39:

> Interpretation of contract language restricting the scope of arbitration is governed by the rigid standards established in the Steelworkers' cases. These require that "only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail * * ", United Steelworkers of America v. Warrior and Gulf Navigation Company, supra, 363 U.S. [574] at 585, 80 S.Ct. [1347] at 1354 [4 L. Ed.2d 1409], and that an order prohibiting arbitration cannot be issued "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." United Steelworkers of America v. Warrior and Gulf Navigation Company, supra, 363 U.S. at 582–583, 80 S.Ct., at 1353. As summarized by the Second Circuit Court of Appeals in Proctor and Gamble Independent Union v. Proctor & Gamble Manufacturing Company, 298 F.2d 644, 645–646:
>
> > "The nub of the matter is that under the broad and comprehensive standard labor arbitration clause every grievance is arbitrable, unless the provisions of the collective bargaining agreement concerning grievances and arbitration contain some clear and unambiguous clause of ex-

clusion, or there is some other term of the agreement that indicates beyond peradventure of doubt that a grievance concerning a particular matter is not intended to be covered by the grievance and arbitration procedure set forth in the agreement. * * * "

As our opinion has demonstrated, it seems clear from this contract that arbitration of this dispute was contemplated.

### IV

The question remains in this case as to what effect, if any, should be given the arbitration award handed down by Senator Bernal, the appointed union representative to what allegedly should have been a tripartite arbitration board. The district court, having found the issue arbitrable, enforced the order of the union appointed arbitrator without any substantive discussion whatsoever in his opinion. We find it necessary, however, to turn to the arbitration procedures section of the contract to determine whether or not the arbitration proceedings were valid.[2]

The contract provides that the union and the company shall each appoint one representative to act as arbitrators. Upon the failure of one party or the other to appoint an arbitrator to represent its side, the arbitrator appointed by the single party shall promptly arbitrate and settle the grievance, with his decision binding on the parties. Our question here concerns whether or not this precise contract provision applies to this factual situation.

■ It is clear that Mr. Harold Alberts, attorney for the company, was designated the company representative prior to arbitration. More precisely, he was designated their representative if any arbitration was going to take place. Yet Mr. Alberts, speaking for himself as arbitrator, and for the company, consistently took the position that the dispute in this case was not arbitrable under the contract. Thus, we have the situation where it appears that one of the appointed arbitrators took the position that the dispute was arbitrable, while the other did not. Even though courts decide in the first instance on arbitrability, because of the extreme presumption in favor of allowing arbitration, the arbitrator is permitted to determine whether or not, under the contract, the dispute is arbitrable. Thus, at this point in time we had two arbitrators in disagreement over this threshold issue.

Of course, in this situation the preferable procedure would have been for these two men to follow the envisioned contract procedures and select a third man who would then, in fact, be the real arbitrator of this case. Apparently the company felt that even to take this step would put them in a delicate position as far as their court suit was concerned. The company probably reasoned if a neutral arbitrator was appointed and found the matter arbitrable that their court suit on arbitrability for all intents and purposes would be worthless. They would then be bound by whatever the arbitrator decided. When the company did not give further response to the union's request for the selection of a third arbitrator, the union representative then went on to decide the issue.

■ The company maintains that it could not be forced to arbitrate this matter until it had been conclusively decided by a court that the matter was arbitrable. This position becomes even more complicated where the employer had tried unsuccessfully to enjoin the arbitration. We note that there was no counterclaim by the union in that suit in an attempt to force the employer to follow the contract procedures. We think under the situation presented by this case that that would have been the far preferable approach. However, since that was not done, we must dig more deeply into this matter to resolve the issue. The result must turn on whether or not this contract can be construed to

---

2. The complete section or arbitration procedures is set out in footnote 1, supra.

allow single party arbitration where one party appoints to representative as called for by the contract but that representative refuses to proceed with the selection of a neutral.

Once each side has named a representative we think the harsh penalty involved in allowing single party arbitration has fallen out of the contract. That is an extreme sanction and over-extension could create more hostility in contravention of the air of peaceful settlement of industrial disagreements through contractual arbitration. Therefore, we hold that this one clause of the contract will be construed strictly to apply only where no representative whatsoever is named to the board. The question then is what was the union to do faced with the company's adamant refusal to cooperate.

■ The simple answer here is that the union should have sought an order from the district court compelling the company to follow the contractually agreed to procedures. There is simply no support in the contract for the proposition that the employer had agreed to let the union representative alone decide the substantive issue. Since there was a readily available alternative (a counterclaim for compulsion to arbitration) available to the union, we do not approve the unilateral arbitration which does not fall squarely within the contract clause.

■ We note that had there been a method whereby an admittedly "neutral" arbitrator was selected and the company merely refused to participate in the hear-

ing we would be faced with a strong case for the award.[3] See Meatcutters v. Penobscot Poultry, ND Me.1961, 200 F. Supp. 879; Boot & Shoe Workers v. Faith Shoe Co., MD Pa.1962, 201 F.Supp. 234; cf. Teamsters v. Braswell, 5 Cir. 1968, 392 F.2d 1. Here, however, the arbitrator who issued the award cannot be denominated a "neutral"[4] as the parties would contemplate the term. Thus, there was no jurisdiction under the contract for this arbitration by a single union designated representative and the award will not be enforced. The contract in question here generally contemplates arbitration by a "neutral" chosen by both parties and provides a method of selection for that purpose. There is one clear exception to the above whenever one party fails to name a representative. As noted, because of the harshness of that sanction and the fact that it, to a degree, is in conflict with the concept of true arbitration, we will construe its provisions strictly. Finding no contractual grounds giving the union representative acting alone the right to issue a binding award, we refuse to enforce that award.

While we feel the district court was correct in finding that the parties had agreed to arbitrate this matter, we are unwilling to say that the method of arbitration followed herein was valid. Thus, the only arbitration which should have been compelled or allowed was one in line with the provisions of the contract.[5]

In conclusion, we find that the underlying dispute in this case is arbitrable

3. Here there seems a strong argument that under the contract the union could have received a list of "neutrals" from the FMCS and, if the company refused to strike any names, pick any one of the five. We feel that selection by such a procedure would be a valid response to the employers recalcitrance and that the award of one so chosen would be enforceable.

4. We mean to cast no unfair light on this arbitrator's integrity by describing him as the "union representative" or not as a "neutral". We are not basing our refusal to enforce his award because of any feeling of correctness, incorrectness or prejudice on his behalf. Rather, we are

refusing to enforce the award simply because there is no basis in the contract for allowing this individual, to arbitrate this case on these facts.

5. We feel part of the legal confusion in this case results from the attempt to enjoin. Apparently only one objection to arbitration—lack of an arbitrable dispute—was raised before the district court. We feel the company should have also sought prohibition of the one-sided arbitration being advanced by the union. The union, for its part, should have requested the court to order the employer to follow contract procedures and select an arbitrator.

under the agreement and direct that the district court order these parties to each select a representative and go about the selection of a "neutral" third member [6] as soon as possible.

Affirmed in part and remanded in part with directions.

6. We note that several issues raised by the parties before the district court on issues of procedure and the like are to be decided by the arbitrators, not the court.